# SAMUEL L. KEITH *et al.*

*v.*

# THE GLOBE INSURANCE COMPANY.

1. INSURANCE—*reforming a mistake in a policy, as to the persons obtaining the insurance.* Where a member of a partnership firm applied for insurance upon partnership property, and in the name of the firm, and the officers of the company so understood the application, but, by mistake, issued the policy in the name of the individual partner alone, it was *held,* a court of equity would reform the policy so as to make it conform to the intention of the parties.

2. SAME—*how far companies are bound by the acts and knowledge of their agents.* And where such application was made to an agent of the company insuring, who was informed that it was the interest of the firm, not that of the individual partner alone, which was to be insured, and agreed so to insure it, the agent at the time having full knowledge of the ownership of the property, the company would be bound by the acts and knowledge of the agent in respect thereto, which would form a sufficient basis upon which to require a court of equity to reform the policy issued by the officers of the company to the individual partner alone.

3. SAME—*by the acts and knowledge of what character of agents companies are bound.* The fact that such agent was not a regular agent of the company would not relieve the latter from being bound, he having previously obtained insurance for the company for which they paid him a commission, and having also obtained the particular insurance and received his commission therefor,—holding such relation to the company he would be deemed their agent in respect to the insurance which he negotiated, and they would be bound by his acts and knowledge concerning it.

4. SAME—*disclosure of facts affecting the risk.* While it is a general rule, that on an application for insurance, all material facts which directly tend to increase the hazard must be disclosed by the applicant, the fact that he is obnoxious to numerous persons in the vicinity of the property sought to be insured, is not within that rule, and need not be disclosed unless he is interrogated on the subject.

5. In this case the property sought to be insured, was a lot of cotton in the State of Mississippi, the insurance being effected in Chicago, and it was held not essential to the validity of the policy that the applicant should disclose, unasked, that the guards who were in charge of the cotton smoked pipes, and had fire in the immediate vicinity for the purpose of warming themselves.

6. SAME—*effect of a seizure of the property insured, by a government officer.* At the time the cotton was insured, the place where it was situated was under military occupation by the United States, and it was held that the mere seizure of the property under the order of a government officer, without evidence of its condemnation, or of an act of forfeiture, would not divest the owner's title, or affect his right to recover the insurance.

APPEAL from the Superior Court of Chicago; the Hon. JOHN A. JAMESON, Judge, presiding.

The opinion states the case.

Messrs. HIGGINS, SWETT & QUIGG, and Mr. ISAAC N. ARNOLD, for the appellants.

A mistake in putting the name of an individual partner in a policy of insurance, instead of the firm name, will not defeat the contract, but it may be reformed in a court of equity. *Ellis* v. *Towsley,* 1 Paige Ch. 278; *Franklin Fire Ins. Co.* v. *Hewett,* 3 B. Mon. 231; *Harris* v. *Columbian Ins. Co.* 18 Ohio, 121; *New York Ice Co.* v. *Northwestern Ins. Co.* 23 N. Y. Rep. 359; *Malleable Iron Works* v. *Phœnix Ins. Co.* 25 Conn. 465; *The Bank* v. *Charter Oak Ins. Co.* 21 Conn. 529.

Although a person may not be the general agent of an insurance company, he will be considered the special agent in the particular case, when he received a commission for effecting the arrangement with the assured. *Woodbury Savings Bank* v. *Charter Oak Insurance Company,* 31 Conn. pp. 518, 519, 526–7–8; 25 Conn. p. 477; *Beebe* v. *Hartford County Fire Insurance Company,* 25 Conn. p. 51; *Malleable Iron Works* v. *Phœnix Insurance Company,* 25 Conn. 465, 528, 529.

In regard to a failure on the part of an applicant for insurance, to disclose facts concerning the property, or circumstances affecting the risk, the rule is, a fraudulent concealment must be proved.

The presumption is that the contract was fairly made.

" The burden of proof of misrepresentation is upon the defendants." *Catlin* v. *Springfield Insurance Company*, 1 Sumner ( U. S. ) Rep. p. 434; 8 Cushing Rep. p. 82.

Defendants must show not only that the fact alleged was concealed, but that it increased the risk. *Newhall* v. *Union Mutual Fire Insurance Company*, 52 Maine Rep. p. 108.

" If enough is disclosed to put the party upon inquiry and they fail to inquire, they are liable." *Beebe* v. *Hartford County Mutual Fire Insurance Company*, 25 Conn. p. 51.

" It is sufficient, in the absence of fraud, if the applicant answer all questions put to him." *Boggs et al.* v. *American Insurance Company*, 30 Missouri, p. 63.

The leading case on the subject of concealment is *Carter* v. *Boehm*, 3 Burrow's (English) Reports, p. 1905.

" The insured need not mention what the underwriter *ought to know ;* what he *takes upon himself* the knowledge of; or what he *waives* being informed of. The underwriter need not be told what lessened the risk agreed and understood to be run by the express terms of the policy. He need not be told general topics of speculation; as, for instance, the underwriter is bound to know every cause which may occasion natural perils; as the difficulty of the voyage—the kind of seasons—the probability of lightning, hurricanes, earthquakes, etc. He is bound to know every cause which may *occasion political perils ;* from the ruptures of states; from war, and the various operations of it. He is bound to know the probability of safety, from the continuance or return of peace; from the imbecility of the enemy, through the weakness of their councils, or their want of strength, etc." (P. 1911.)

In *Boggs et al.* v. *American Insurance Company*, 30 Missouri, p. 70, the Court say :

" In contracts of fire insurance, there being no fraud, if the applicant make a true and full answer to the questions put to him by the insurer in respect to the subject of insurance, it is enough ; he is not answerable for any omission to mention the existence of other facts about which no inquiry is made

of him, though they may turn out to be material for the insurer in taking the risk; (*Gates* v. *Madison County Mutual Insurance Company*, 5 N. Y. 475,) because, observes the the Court, " he has a right to suppose that the insurer, in making the inquiries in respect to the particular facts, deems all others to be immaterial to the risk to be taken, or that he takes upon himself the knowledge or waives information of them."

Mr. JAMES L. STARK, for the appellees.

In this case, Holmes & Brother were not the agents of the Globe Insurance Company, in any such sense as that notice to them would be notice to the company. Angell & Ames on Cor. secs. 306, 307; *Bank of U. S.* v. *Davis*, 2 Hill, 462; *President, &c.* v. *Conner*, 37 N. Y. 320. The cases cited by appellants on this subject relate to local agents acting for the company generally.

There is no doubt but what a court of chancery will correct a written instrument for a mistake, but the mistake must be made out by full proof. 1 Story Eq. Jur. sec. 157; *Shay* v. *Pettes*, 35 Ill. 362; *Ruffner* v. *McConnel*, 17 Ill. 216; *Hunter, Admr.* v. *Bilyeu*, 30 Ill. 248.

The property insured was a lot of cotton in the State of Mississippi, owned by northern men. That portion of the country was still under military control. The owners of the cotton were obnoxious to the people of that locality, for reasons growing out of the war. That fact should have been disclosed to the insurer. 3 Kent's Com. 385; Angell on Ins. sec. 172; *New York Bowery Ins. Co.* v. *The New York Ins. Co.* 17 Wend. 357; *Stebbins* v. *Globe Ins. Co.* 2 Hall, 612; *Delongnemars* v. *Tradesman Ins. Co. of N. Y.* 2 Hall, 580; *Vail* v. *Phœnix Ins. Co.* 1 Wash. Cir. Co. R. 283.

The cotton had been seized by the United States government, and was in the possession of the government when it

was burned. This being the case, the assured can not recover. *Pipon* v. *Cope*, 1 Campb. 434.

Mr. JUSTICE WALKER delivered the opinion of the Court:

This was a bill in chancery, filed by appellants against appellees. It alleges that during the summer and autumn of 1865, the firm of Keith, Snell & Taylor purchased and placed in store at West Point, in Mississippi, a quantity of cotton, for which they paid a large sum of money. To make these purchases the firm, through Samuel S. Keith, one of the partners, procured the money on a loan from the Third National Bank of Chicago, in the name of and for the firm.

On the sixth of December, 1865, Keith applied to Ira Holmes, the cashier of the bank, who was also, with his brothers, general insurance agent at Chicago, to procure a policy of insurance on the cotton. Holmes was also the treasurer of appellees. On being spoken to on the subject, Holmes referred Keith to Holmes & Brothers, to make out the policy. Ira had previously instructed Holmes & Brothers, that when an application should amount to more than the companies which they represented wished to take, to place the amount with appellees. An agreement was made by Keith and Holmes & Brothers, they acting for various insurance companies, to insure the cotton.

A certificate of insurance was made to Keith individually. The amount of insurance applied for by Keith being larger than the companies for which Holmes & Brothers were agents, were willing to take, they applied to appellees and obtained a policy from them for $7,500 on the cotton. It was burned on the sixth of January, 1866. Appellees refused to pay, on the ground that, if liable at all, they were liable to pay only one-third of the loss, because the certificate was made out to Samuel L. Keith in his individual name, and as he owned but a third interest in the cotton, they were only liable to make

good his loss, and not that of his partners. Thereupon appellants filed this bill to reform and enforce the contract as it was made, and should have been written, alleging that the insurance was made for the firm, and that he so informed the agents, and was assured by them that it should all be made right, but they had taken it in his individual name. On the hearing in the court below, the relief prayed was refused and the bill dismissed.

Complainant, Keith, testified, that he went to Holmes & Brothers on the sixth or seventh of December, 1865, to procure an insurance on two hundred and twenty bales of cotton, worth $52,000; that he saw Edgar and Albert Holmes and informed them of his business; stated to them the quantity of cotton, and where and how it was situated, and that it was guarded night and day; that it belonged to Keith, Snell & Taylor, and would be consigned to Keith at New York, and only awaited transportation to that point, and Albert Holmes said he would take the risk; that the rate was agreed upon; that he then made out a list of the companies by which the insurance would be made; that the amount was fixed at $49,500; that Holmes said the companies they represented could take but $42,000, but he would go out and get another company to take $7,500 more, making the amount; that on the same or next day he met Albert Holmes and he said that he had placed $7,500 in the office of appellees; that he said to him the cotton belonged to Keith, Snell & Taylor, to be consigned to Keith at New York, and asked if it would make any difference whether the policy was issued in his name or that of Keith, Snell & Taylor; if it would, to issue it in the name of the firm and not in his; that Holmes replied that he did not think it would, but he would make it all right; that Ira Holmes, the treasurer of appellees, knew to whom the cotton belonged; that before applying for the insurance he saw Ira Holmes and asked him if he wanted the risk; that he told witness to go to the insurance office and they would fix it up, and that he went and made the arrangement; the

premium was not paid at the time, as the time the policy would run was not then fixed, as that depended upon when it would be shipped; that the premium was paid in the latter part of January or early in February; that after the loss, he had a conversation with Ira Holmes and he said he was treasurer of appellees, and if the loss was a straight one, their company should pay it without taking any advantage of technicalities in the policies; that he said he knew the cotton belonged to Keith, Snell & Taylor, and if it was a fair loss no advantage would be taken by reason of its being in Keith's name; that after the proofs were made he heard no objections by Holmes or any officer of the company in regard to the proofs; that Holmes & Brothers held the policy at the time of the fire and when the premium was paid; that in the month of May he consulted Swett at his office, when the policies were sent for, and that he and Swett then went to the office of Holmes & Brothers and asked them to change them to Keith, Snell & Taylor; that they did not deny that the cotton belonged to or was insured for the firm, but said that as some trouble was likely to grow out of the transaction they declined to make the change.

Joseph A. Holmes corroborates Keith in the material portions of his evidence, and further says that he took the certificate of insurance to appellees' office and requested the Secretary to insert the words " loss, if any, payable to Keith, Snell & Taylor," and as a reason for the request, informed him that the cotton belonged to that firm, and he thereupon inserted the language as desired; that appellees paid Holmes & Brothers ten per cent. of the premium for soliciting or obtaining this insurance. He said he thought Ira Holmes, treasurer, knew of the insurance at the time the policy was issued; that he paid the premium, $75, less their commissions, to appellees on the twenty-fifth of January, 1866, and after he heard of the loss.

Ira Holmes corroborates Keith's evidence in part, and does not contradict his testimony. He also says, that when the

insurance was taken, he, as treasurer of the company, knew the cotton belonged to Keith, Snell & Taylor; that he thinks Bowen, the president of the bank, knew the purpose for which the money was loaned, and knew of the insurance of the cotton soon after it was effected.

Rawley testifies that he was employed and was in Holmes & Brothers' office when Keith applied for the insurance; that after Edgar Holmes said he would take the risk, he made an entry in the book; Keith observing that it was made in his name, informed Holmes that the firm was Keith, Snell & Taylor, and after noticing the entry, asked Holmes whether it would be right to use his name instead of the firm; that Holmes told him it would make no difference; that Keith said the amount of insurance wanted was $49,500 and the cotton belonged to the firm; that the amount was calculated at so much a bale; that the rate was high, the risk being regarded as very hazardous. Albert Holmes, however, says he has no recollection of Keith saying that he wanted the insurance in the name of the firm, or of saying that it would make no difference if it was in Keith's name, or that he would make it right.

Swett testified that he went with Keith, in the month of May, 1866, to the office of Holmes & Brothers, and there had a conversation with one of the Holmes in reference to the policies; that Holmes stated that he had contracted to insure the full amount of the cotton, and had been paid the full premium; that he knew the cotton belonged to the firm of Keith, Snell & Taylor. On being asked to change the policy, he declined, saying trouble had arisen in reference to the matter.

From this evidence, it is manifest that Keith intended to insure and supposed he had insured the entire property, and not merely his interest in it. He expressly applied for the insurance in the name of the firm, and seeing the entry in the book in his name, asked whether it would not make a difference if it was not in the name of the firm, and at the same

time stated that it belonged to his firm, when Holmes said he thought not, but would make it right. The mind can arrive at no other rational conclusion, from this evidence, than that Keith intended to insure and supposed he had so insured the property for the firm and not his separate interest.

Again, Holmes ascertained the amount by calculating its value by the number of bales, and not by calculating the value of Keith's interest in the cotton. Keith also paid the premium on the full amount of the cotton and not on his interest. From all of these facts we must conclude that the agents understood, and could have understood nothing else than that Keith desired to insure the entire lot of cotton in the name of his firm. And it is equally clear that the agents agreed to do so when the application was made; and we will not presume that they designed to perpetrate a fraud on Keith. That it was not so insured by the agents, must have arisen from inattention or from a want of knowledge that it was material that the firm name should be inserted in the policy as the assured. And we presume it was for the latter reason, from the fact that they had inserted, "loss, if any, payable to Keith, Snell & Taylor," perhaps under the supposition that such a clause would have the same effect as inserting the firm name as the assured.

It, however, remains to ascertain whether the officers of appellees' company understood and intended to insure the entire interest in the cotton held by Keith's firm. They knew they were insuring all of the cotton, and not an undivided interest. They received a full premium, and specifically state that they had insured two hundred and twenty bales. Their treasurer knew that the firm had borrowed money from their bank to purchase the cotton, and it nowhere appears that Keith ever owned any cotton in his individual right, much less this large quantity. They must, therefore, have known what Keith's interest was, and the true ownership of the property, when the policy was issued, and they must also have known that the sum at which it was valued was three-fold the value

of his individual interest. This might not, of itself, be suffi-
cient to establish a mistake requiring a reformation of the con-
tract, but it is strong evidence when considered in connection
with the other circumstances of the case.

In addition to all this, Holmes & Brothers were the agents
of appellees. They, it is true, were not their regular agents,
but they had previously solicited insurance for them, and had
been paid a percentage therefor, and were in this case paid
ten per cent. of the premium received by appellees on this
policy, and one or more of the members of the firm of Holmes
& Brothers were stockholders in the company, and Ira was
not only a stockholder, but was the treasurer of the company,
and a member of the firm of Holmes & Brothers. The firm,
therefore, had notice of the nature of the application, and
agreed to insure in the name of Keith, Snell & Taylor.

In the case of *The Atlantic Ins. Co.* v. *Wright*, 22 Ill. 462, it
was held, that if an agent of an insurance company is informed
of all the facts connected with the interest of the assured in the
property described in the policy, and does not require a state-
ment of the same, the company will be bound by his acts and
can not avoid the policy, because the true interest was not
stated, but will be estopped by the acts of their agents. And
the same rule has since been repeatedly recognized and applied
by this court. Then, if knowledge by the agent is sufficient
to charge the company, much more, an application disclosing
all the facts, and a request by the assured to have it insured
according to that interest, and an agreement by the agent to
do so, should bind the company. Holmes & Brothers, then,
acting in the capacity of agents of appellees, and having been
fully informed that it was the interest of the firm, and not
Keith's alone, that was to be insured, and having agreed to do
so, when coupled with the knowledge of the circumstances of
the ownership of the cotton, and their receiving a premium on
the full value of all the cotton, and not of Keith's interest,
we think, fully establishes the mistake in executing the policy;
and requires that it should be reformed so as to make Keith,

Snell & Taylor the assured, as was intended by the parties when it was issued.

A careful perusal of the evidence convinces us that there could not have been two hundred and twenty-five bales of cotton destroyed by the fire. It is true, appellants' witnesses all estimate the number at two hundred or more. But appellees' witnesses fix the number from the lowest, at seventy-five, and the highest at one hundred and fifteen; the larger number at about one hundred bales. The witnesses on the part of appellees are more numerous. There were ten or eleven witnesses, including Taylor, and the certificates of two others, on the part of the appellants, who fix the number at from two hundred to two hundred and twenty. On the other side, there are thirteen or fourteen who place it at less than one hundred and sixteen. Besides, Collins swears that the guard sold what was known as Taylor's cotton, of nights, and on one night when he was guarding cotton of his brother, in the same shed, some seven or eight bales were hauled away, the guard assisting to load it into the carts or wagons. In this conflict of evidence, it is difficult to determine the true amount that was burned, with any degree of certainty, but we are inclined to believe that it did not exceed one hundred bales. There seems to have been more of appellees' witnesses who counted one tier of the cotton, and thus estimated the number of bales by the number of tiers, than of appellants' witnesses. It is true, appellants prove that some three of appellees' witnesses were on very unfriendly terms with Taylor. But one of their witnesses was a railroad agent, who had been spoken to by Taylor, in reference to shipping the lot of cotton, and who examined it but a day or two previous to the fire, with a view to its shipment, and he, by a count of one tier and multiplying the number of bales it contained by the number of tiers, made it but ninety-seven.

Appellants proved by different persons, that they had sold and delivered to Taylor, small lots in the shed, in the aggregate, sixty-four bales. They also proved by an agent, who

purchased and acted for them from the eleventh of October, 1865, until the first of December, that the whole number of bales was one hundred and thirty-six. He says, it was purchased in small lots, in October and November, 1865, and delivered at various times. Without appellants, shall adduce further and more satisfactory evidence as to the number of bales burned, we think that one hundred is the highest number a court would be warranted in finding were thus destroyed.

For the error indicated, the decree of the court below must be reversed, and the cause remanded for further proceedings not inconsistent with this opinion.

*Decree reversed.*

At the September term, 1870, a petition for a rehearing of this cause was presented on behalf of the insurance company, in disposing of which, the court delivered the following additional opinion :

Per CURIAM : A petition for a rehearing has been presented in this cause, which we have attentively considered, but are unable to perceive any reason for changing the conclusions at which we arrived when we rendered the decree of reversal then announced. But inasmuch as we omitted to discuss one or two points urged in the argument previously filed by appellees, we deem it proper now to consider them.

It is urged that appellants failed to disclose facts that added greatly to the hazard of the risk, and which, if disclosed to appellees, would have prevented them from taking the risk, or would have added to the premium. It is first said, Taylor was obnoxious to the people in the vicinity of the place where the cotton was stored, and that fact should have been disclosed to the company when the application was made. It is a general rule, that all material facts, which directly tend to increase the hazard, must be disclosed by the applicant. While this is true, the rule must have a practical application. It can not be said that because the assured was at variance with a few

34—52ND ILL.

530        KEITH *et al. v.* GLOBE INS. CO.        [Sept. T.,

Additional opinion of the Court.

persons, he is bound to disclose the fact to the agent of the company, to render his policy binding. Nor is he required to inquire whether he is popular or unpopular, that he may disclose the fact to the company. No case has, we presume, gone that length. If, however, the assured be interrogated when he makes the application, then he must give true answers on all matters connected with the hazard of the policy.

In this case, we must presume that the agents of appellees were as fully apprised of the unsettled condition of the country in the vicinity of West Point, Mississippi, as were the applicants. As intelligent men, they must have been fully aware of the fact, that northern men, at that time, were obnoxious to the people of that locality. That was a matter they must have known as well as appellants.

It is likewise urged, that the disclosures were not full as to the situation of the cotton, or the manner it was guarded. Keith, so far as is disclosed by the evidence, did give a full statement of the place where it was stored, and its exposure to fire from passing engines. It is true, he did not inform the insurance agents that the guards smoked pipes, and had fire in the immediate vicinity for the purpose of warming themselves. But at the season of the year at which this transaction occurred, it being in the winter, all persons know that fire would be necessary to the guard, and that it must be kept within, or near to the building, to be of use to the guard. And no questions were asked in reference to the fire, nor as to whether any of the guard smoked. The probabilities are, that it did not occur to either of them that the cotton might be thus exposed, and it is not probable that Keith could have answered, had the questions been propounded to him by the agents. We can see no evidence of fraud or bad faith in failing, unasked, to disclose the facts of which complaint is now made.

It is urged that inasmuch as the cotton was seized under the order of a government officer, appellants can not recover. None of the grounds of the seizure appear in the record, unless we might infer that it was procured to be done by a person

whose cotton had been seized, on information furnished by Taylor, as a matter of retaliation. We are entirely uninformed whether the seizure was warranted by the facts, and we are not at liberty to infer, in the absence of proof, that there were legal grounds for the action of the officer. The seizure did not, and could not, of itself, divest appellants of their title to the cotton. There was, so far as we are advised, no trial or condemnation, nor is there any proof that appellants had done any act authorizing a seizure. We are therefore constrained to hold that the mere seizure, unaccompanied with the evidence of its condemnation, or proof of an act of forfeiture, could not divest appellants' title or bar a recovery. If it has been held that a seizure by government produced such a result, it could only be where it appeared that the owner had done some act which forfeited the property, which had been followed by a seizure by the government. Beyond that, we could not assent to go, in the application of the rule. In this case the evidence does not show that fact.

That the property was seized, and was subsequently guarded by government troops, was one of the perils incident to the military occupation of the country where the cotton was stored. The condition of the country must have been known and considered in fixing the premium, which was at the highest rate they charged. Nor does it appear that there was more hazard to the cotton from the military guard, than would have been incurred by a guard of citizens. That the military authorities would be as careful as citizens, we may reasonably suppose. The guard were under military discipline and were accountable to that authority, and it may be inferred that they would feel as much or more responsibility for their conduct than would citizens of the place with whom appellees contend Taylor was unpopular. From a careful examination of the entire record, and mature consideration of appellees' argument previously filed, together with their petition for a rehearing, we are unable to perceive that the decree heretofore rendered is in any respect erroneous.

*Rehearing denied.*