John F. Booth, Plaintiff-Appellee, Cross-Appellant, v. Cole Corporation and June C. Stern, d/b/a M. M. Cole Publishing Company, Defendants-Appellants, Cross-Appellees.

Gen. No. 53,828.

First District, Second Division.

February 10, 1970.

Altheimer, Gray, Naiburg, Strasburger & Lawton, of Chicago (Joseph J. Strasburger, Lionel G. Gross, Howard L. Kastel, and Roger B. Harris, of counsel), for appellants.

Stone, Epstein, Lynch and Corby, of Chicago (Bernard M. Epstein, of counsel), for appellee.

MR. PRESIDING JUSTICE McCORMICK delivered the opinion of the court.

In 1923, when John Booth was fifteen years old, he began working for Morris Cole, owner of a music publishing business then known as M. M. Cole Publishing Company. In 1935 the name of the company was changed to the Cole Corporation, and in 1964 was again changed back to M. M. Cole Publishing Company as a sole proprietorship of June Stern.

In 1958 the Cole Corporation executed pension contracts with John Booth and two other employees, Am-

brosine Schuham and Charles Fine. Booth's contract provided in substance that when the corporation retired him he would receive $50 a week for the rest of his life, with payments to cease upon his death. At the time Booth was receiving $100 a week. Morris Cole died a few months after the contract was made, and his widow, Leona Cole, continued to operate the business until her death in 1963.

Leona Cole's estate was distributed through use of a "family settlement agreement" in which the corporate assets were given to her two children; the music publishing business to June Stern, and beneficial ownership of the building to Charles Cole. Max Becker, a certified public accountant, and the executor of Leona Cole's estate, testified that this method of distribution was chosen in order to minimize estate taxes. He stated that the contract with the plaintiff in no way affected the decision as to the method of distribution.

The "family settlement agreement" amounted to a liquidation of the corporation. The executors of the estate were secured against claims by the deposit by June and Charles of over $300,000 with the executors. The plaintiff asserts that the corporate liquidation accelerated his right to receive his pension funds and that the corporation treated the pension contract as a matured debt when it set aside $42,149.46 in the estate tax return for the contingent liability of the "Booth contract." (The Internal Revenue Service reduced this figure to $34,-730.78.) Plaintiff contends that he was retired when the corporation was liquidated; that his debt matured at that time, and that he is therefore now entitled to a lump sum payment based on the weekly pension payments multiplied by his life expectancy.

The theory of plaintiff's case rests upon the alteration in the form of ownership of the Cole business. Had Leona Cole simply given each child one half of the stock

in the existing corporation, Booth would have remained in the employ of the same entity; however, for tax purposes the assets were distributed to June and Charles in kind. The plaintiff contends that such distribution amounted to a breach of Cole Corporation's obligation to him, thereby maturing the contract and making immediately due approximately $34,000. He argues that he could not be required to remain in the employ of any other than a corporate successor of Cole Corporation to be eligible for his pension rights, and that the sole proprietorship of June Stern was not such a successor.

While the 1958 agreement stated that "Booth has been serving the Corporation as Stock Manager more than thirty-five (35) years last past; . . . ." that statement technically was inaccurate, since from 1923 to 1935 Booth had worked for the M. M. Cole Publishing Company, which then became the Cole Corporation, and he had worked for that company from 1935 to the time of the 1958 contract. Thus, he had really worked for the Cole Corporation twenty-three years at the time of the contract, although he had been in the employ of the company business for thirty-five years at the time of the 1958 contract.

We call attention to this fact in order to show that the contracting parties themselves were apparently not concerned about the name under which the family business was continuing or the technical form of ownership of the business. It then appears that when the contract stated that Booth had worked for "the Corporation" for thirty-five years, it was meant that he had been with the family organization for that long, although the organization had undergone a technical alteration in name and perhaps in form of ownership.

We believe this is relevant because the plaintiff has based most of his argument on the fact that subsequent to the 1958 contract with "the Corporation" the form of ownership was changed to a sole proprietorship, which

alteration amounted to a breach of his pension contract with "the Corporation." We feel, however, that the parties showed their intent that the form of ownership not be considered a critical factor; rather, the important question was whether Booth worked for the family company, regardless of the form.

Our conclusion is not reached only because of the loose terminology in the contract, but we consider that the contract also provided for the performance of the corporation's obligation by "heirs, executors, administrators, or successors." The chancellor seized upon this language to determine that the contract intended that the obligation to pay Booth the pension would not terminate upon Booth's death, but rather, that the pension should be payable to Booth's "heirs, executors, administrators, or successors." However, this interpretation is contrary to the language of the contract which states: "Beginning with the first week of such retirement and continuing thereafter until his death, . . . the Corporation shall pay to Booth the weekly sum of Fifty ($50.00) Dollars. Upon the death of Booth during his retirement . . . payments provided hereunder shall cease and terminate. It is not intended by the parties that the benefits of this agreement be assigned or anticipated or made available to anybody other than Booth, so that any payments to be made hereunder shall cease and terminate with the death of said Booth." It is true that the last clause reads, "This agreement shall be binding upon the parties hereto, their heirs, executors, administrators, or successors." However, it would be a wholly unjustified conclusion to say that the "binding" clause shows that the payments were to go to Booth's heirs upon his death. The contract could hardly be made more clear on the point that the obligation to make the pension payments to Booth was to cease upon his death.

It would appear that the purpose of the "binding" clause was to make the obligation one which would be

imposed on any subsequent successor in interest of the Cole Corporation, which conclusion is consistent with the general tenor of the contract. The parties appear to have used the term "corporation" loosely with reference to the Cole family business, and the pension contract seems to have carried through in the same manner. In other words, regardless of the form of ownership, those carrying on the business would still be bound by the contract.

The trial judge concluded that the contract had not matured and accelerated; nevertheless, the judgment gave the plaintiff practically all he was seeking, under a different theory. The court determined that the 1958 pension contract "does not accurately express the intention of the parties" and that "the attorney who drafted this extraordinary document was guilty of mistake or fraud." According to this view, the court reformed the contract to include, inter alia, the following:

1) The plaintiff was to have the right to retire at any time he chose although his employer could retire him only after he reached the age of 65;
2) The plaintiff was to be paid $300 per month until a total of $35,000 was paid him, and if he died prior to the total payment the balance was to be paid to his heirs;
3) The defendants were required to deposit $35,000 in trust to secure the monthly payments to plaintiff.

This interpretation then was not a contingent obligation to pay $50 a week to Booth during his lifetime after his retirement from the company or involuntary disability, but was instead a matter of an absolute obligation to pay $35,000. These reformations were in error and the trial court's decretal orders to that effect are reversed.

The plaintiff had petitioned for allowance of attorney's fees and expenses; the trial court denied the request, and

plaintiff cross-appealed for attorney's fees. On this matter we feel the trial court was correct, and the plaintiff is not entitled to the attorney's fees.

 Reformation is a remedy which must be employed carefully and misuse of its application can lead to far more damage than would be occasioned by allowing the instrument to remain unchanged. It should be reformed only when clear and convincing evidence compels the conclusion that the instrument as it stands does not properly reflect the true intent of the parties involved, and that there has been either a mutual mistake or a mistake of one of the parties, and a fraud perpetrated upon him by the other side.

With reference to the applicable standards regarding the use of reformation, see Hyman-Michaels Co. v. Massachusetts Bonding & Insurance Co., 9 Ill App2d 13, 20, 132 NE2d 347; Michigan Mut. Liability Co. v. Type & Press Co. of Illinois, 62 Ill App2d 364, 371, 210 NE2d 787. For cases discussing mistake and fraud, see Hyman-Michaels, supra; Almer Coe & Co., Inc. v. American Nat. Bank & Trust Co. of Chicago, 44 Ill App2d 104, 111, 194 NE2d 14; and Harley v. Magnolia Petroleum Co., 378 Ill 19, 28, 37 NE2d 760.

 The facts in the case before us do not justify the use of remedy of reformation. The trial court said it had looked at the pension contracts executed in 1958 with two other employees (Charles Fine and Ambrosine Schuham) and the Fine contract was received in evidence. Both the Booth and Fine contracts provided for weekly retirement payments of $50, but the Fine contract provided that upon Fine's death the weekly payments were to continue thereafter for the life of his wife, and upon her death all payments were to cease. The 1958 agreement with Schuham was not in evidence. The minor difference between the Booth and Fine contracts could be explained on several grounds, but whatever the rea-

son, it does not justify the conclusion that the Booth contract was unconscionable. We know of no rule of law which compels an employer to enter into identical agreements with all employees or have a court compel an employer to grant to all employees precisely the same benefits.

In 1962 the Cole Corporation executed a new pension contract with Schuham to replace the 1958 contract, and in 1964 a new contract was executed with Fine to replace its 1958 contract. By that time Morris Cole, the author of all the 1958 contracts, had been dead for years, yet the trial court relied on the content of those documents to determine the true intent of the 1958 Booth contract. That contract was clear on its face; there were no ambiguities and no evidence that the document included or failed to include any erroneous provisions, nor was there any evidence of fraud. Under these conditions the trial court should have looked only at the Booth contract.

■ The trial court set out certain conclusions of law which, after detailing the provisions in the 1962 and 1964 contracts of Schuham and Fine, respectively, said: "Thus, the Court is provided with a guide to the intentions of Morris Cole with respect to the contract as expressed by his heirs and successors." We fail to see how those contracts could serve as an aid in determining what Morris Cole meant by the contract he negotiated on behalf of the corporation in 1958. The 1958 Booth contract speaks for itself, and it is not within the province of the court to rewrite contracts simply because of its disapproval of some of the provisions contained therein.

Prior to trial the court entered an order directing that $55,000 then held by Max Becker as executor for the estate of Leona Cole, be held by Becker in *custodia legis* subject to further court order. The defendants have requested that this order, the decree, a subsequent order waiving the requirement of posting bond in regard to the

*custodia legis,* and the order which modified and diminished the conditions upon which plaintiff's rights are predicated, all be reversed and the cause remanded with instructions that an order be entered dismissing plaintiff's suit. However, the defendants also made the following statement in their brief:

> "Alternatively, should this Court feel it necessary, defendants suggest that a decree might be entered providing that plaintiff may commence receiving his $50 per week payment at a specified date—such as upon attaining customary retirement age of 65. Such decree might also provide, as defendants proposed in the Court below, for the making of a security deposit with a bank or trust company in an amount sufficient to ensure that adequate funds would always be available for payment of plaintiff's weekly pension benefits in the event of default by defendant."

In the trial court defendants offered "to permit the plaintiff to retire immediately, or at any time he chooses, and to commence receiving his $50.00 weekly payments, even though plaintiff has not yet reached normal retirement age and has only just attained age 60." At another time counsel for defendants said: "We recognize we have an obligation on retirement to pay him $50.00 a week and have offered and undertaken to assume it. We do so again and reaffirm it in open court to retire him immediately." The defendants draw this court's attention to their offers made in the trial court, but now say that "since plaintiff at the date of this writing is only 61 years old, and since defendants have incurred significant expenses in connection with this appeal, they would prefer not to be required to commence paying plaintiff's benefits until he attains age 65."

We recognize that the 1958 contract contains no cut-off age at which Booth could retire and still obtain the

pension benefits. Under the terms of the contract he could obtain the benefits only by being retired by the company or by becoming permanently disabled. Nevertheless, the defendants have asserted in open court and before this court that they would be willing to retire Booth, thus commencing his payments.* They now attempt to amend the lower court offer by making payments commence when the plaintiff is 65, rather than immediately. We feel that their being compelled to undergo substantial costs since the initial offer was made is not sufficient reason to require our having payments postponed. Accordingly, we are adopting the defendants' alternative suggestion and reversing the trial court's orders and decrees pertaining to the reformation, and are remanding the cause with instructions to enter an order providing that the payments of $50 a week to John F. Booth shall commence immediately. Payments are to be made by June C. Stern, d/b/a M. M. Cole Publishing Company, and the obligation is to be binding on heirs, executors and administrators of Mrs. Stern.

The decree shall also provide that a security deposit of $35,000 be deposited with a bank or trust company to insure that adequate funds will always be available for payment of plaintiff's weekly pension benefits. This judgment is to replace all decrees, judgments and orders relative to the *custodia legis* fund.

On the issue regarding his right to obtain attorney's fees, plaintiff argues that the court had before it custody of a part of the trust funds—the $55,000 ordered held in *custodia legis*—and thus, out of that fund the plaintiff's claims should be paid so that equity can be done to his rights. This argument is based on the notion that the court had before it an instrument which required the court's interpretation, and that the attorney's

---

* The trial court entered an order allowing Booth to retire "without prejudice" to his claims under the pension contract.

services consisted primarily, if not entirely, upon obtaining an interpretation of the instrument.

All cases cited by plaintiff on this issue have involved interpretation of wills. However, we do not feel that we need reach the question of whether this rule is restricted to will contest cases, since in the present matter the trust fund was not a necessary part of the suit. The trial court apparently entered the order solely as a protective device for the plaintiff, but further stated that an interpretation of the "family settlement agreement" from which the $55,000 was ordered held in *custodia legis* was not necessary to the disposition of the case. The trial court correctly denied the plaintiff's motion for attorney's fees.

Affirmed in part, reversed in part, and remanded with directions.

LYONS and BURKE, JJ., concur.