MARY F. QUINN, appellee, v. MUTUAL BENEFIT HEALTH AND ACCIDENT ASSOCIATION, Omaha, Nebraska, appellant.

No. 48124.

(Reported in 55 N.W.2d 546)

November 11, 1952.

Jacobson & Bristol, of Waukon, and Elliott, Shuttleworth & Ingersoll, of Cedar Rapids, for appellant.

Sherman Hart, of Waukon, for appellee.

Mantz, J.—This is an equitable action growing out of a claim made by plaintiff on a health and accident policy issued to plaintiff, Mary F. Quinn, by the Mutual Benefit Health and Accident Association, of Omaha, Nebraska.

In her petition plaintiff alleges, among other things, that by mutual mistake the company failed to issue to her the policy of insurance ordered and promised and that the one issued contained therein certain restrictions and exclusions not contem-

plated by her when the policy was ordered. She asked that the policy be reformed and that she be awarded certain cash benefits which she claimed were due her thereunder. The defendant denied her claim and alleged that she received the policy ordered and contemplated and that plaintiff was not entitled to a reformation of the policy issued or any other relief as prayed for.

The court tried the case and found for the plaintiff, ordered reformation of certain parts of the policy as set forth in its findings of fact and awarded her a money judgment against the defendant. This appeal followed.

I. The evidence in this case is not extensive and basically there is little conflict therein.

Plaintiff, Mary F. Quinn, desired a policy of insurance and in order to secure one she, by her agent and in person, contacted a representative of the defendant, one Emmett Sullivan, of Waukon, Iowa. That plaintiff wanted a certain kind of a policy with a certain coverage and so advised the representative of the defendant is abundantly shown. That there were discussions and conferences between the parties as to the kind of policy and the coverages sought and the assurance of the representative that the company had and would issue such a policy was also fully shown. It further shows without serious conflict that at the request of the representative of the company plaintiff went to his office where the agent prepared and filled out an application and plaintiff signed the same without reading and understood that the policy would not issue until the same was approved by defendant. It further shows that a policy was issued and was sent to the representative, who in turn delivered it to plaintiff; that she did not read it and placed it in her lockbox; that both plaintiff and the representative then understood it was the policy she desired.

The policy was issued July 6, 1945, and about December 1947 plaintiff had an operation involving female organs. Later, with the aid of the representative, she made out a claim for benefits which claim the company refused to pay on the grounds that such was not covered by the policy and was one within the exclusion clause. The evidence shows that this was the first time plaintiff was advised that the policy did not cover such kind of claim.

The policy issued was an exhibit in the trial of the cause. The controverted part of the policy is as follows: "This policy does not cover death, disability or other loss * * * resulting from pregnancy, childbirth, or complications arising therefrom or from any disease of organs which are peculiar to women."

One of the witnesses for the plaintiff was James Hart, an attorney, of Waukon, Iowa. He was an officer in the Waukon Investment & Trust Corporation. Emmett Sullivan of Waukon was the active manager of that company. Hart and Sullivan had separate offices in the same building. Sullivan was the local representative of defendant-company. Hart talked with Sullivan and told him that plaintiff was interested in getting a policy of insurance. Hart testified he told Sullivan that plaintiff wanted insurance but she wanted some that would protect her the same as a man and "she didn't want any that would have any exceptions" because of her being a woman, and she wanted insurance which would pay for medical and hospital expenses. He claims that he said, "Now, Emmett [Sullivan], have you got any kind of a company that has such insurance?" Sullivan said "yes" and then referred to defendant-company. We quote from Hart's testimony: "I want it understood that this policy that you are going to get here in this company will apply to her and that there won't be any restrictions because of the fact that she is a woman, it will cover any accident and any kind of sickness that she may have; and I also want a policy for her that will pay her hospital and her medical expenses without any limitations on that. And he said 'yes' that this company would give her that kind of a policy, and I said, 'Well, you get it ready and have her come in whenever you want her to sign the application', and that was the first conversation I had with him about it."

Hart further testified that about a week later he again talked to Sullivan about the policy which plaintiff wanted and in that talk Sullivan said he had word from defendant there was " 'a different kind of a policy now that is of more benefit to the policyholder' " and would pay longer than the other policy talked about, and he thought " 'it would be a good idea for her to take it.' " Hart then asked Sullivan: "Would it protect her for any kind of sickness and any kind of accident and would it pay her hospital and medical expenses? *·* * If it wouldn't she doesn't

want it * * *." Sullivan answered, " 'Yes, it would protect her for any sickness and any accident, and would pay her hospital and medical expenses.' " Hart testified that he then told Sullivan, "If it would do that, why, make it out for that policy."

Plaintiff testified that sometime in June 1945 she arranged with James Hart to obtain for her a health and accident policy; that Hart told her to see Sullivan; that she went to see Sullivan and. told him that she wanted "such a policy that would cover everything, female trouble, and would take care of all sickness and things like that." She said that he asked her a few questions; that she signed an application without reading it, and paid him; that later he gave her the policy; that she put it in her bank box without reading it, and she says that she "took his word for it." Later Sullivan helped her fill out the claim, which the company refused. She says she understood that an application had to go in before the policy issued.

After the claim had been sent in and rejected a representative from the company at Omaha, a Mr. Eischeid, came to Waukon and with Sullivan, Hart and plaintiff had a conference. The Omaha man said "the claim would not be paid" because the policy did not cover it, at that time. Hart testified that he knew now such was in the policy, but that was not the kind of a policy ordered and "it wasn't the kind of a policy * * * I thought she was getting. Then I went on and told him just the conversation between Sullivan and me, the two conversations, and Sullivan was there, and I said to Sullivan, 'Isn't that the way it was?' and he said, 'Yes, those were the talks we had.' "

Hart then stated that there was some talk of a lawsuit and that he spoke to Eischeid: "Sullivan and I are agreed that that is what happened and I think it is the law then that we are entitled to reformation of the policy." Eischeid then said, "You don't think Sullivan is going to testify to that, do you?" I said, "You heard him say it was true." Eischeid then said, "Yes, he will say it here, but he won't say it on the witness stand." I said, "Why not? You mean he will perjure himself?" Eischeid said, "Perjure himself or lose his job." It is rather significant that there is no denial of this evidence.

Sullivan testified for both parties. He told of his two talks with Hart and said that Hart wanted a policy for plaintiff that

covered everything; told of taking the application to plaintiff and of asking questions and writing down her answers; that she did not read it, but signed. The policy was Exhibit 1, the envelope was Exhibit 3. The question was then asked, "When you delivered Exhibits 1 and 3 to appellee did you believe there were no exclusions in the policy as to female diseases? A. Yes." He further stated that he was present when they had the talk with Eischeid. Asked as to the talk, he said: "A. All I remember was that we talked to Hart and plaintiff, and he said they could not pay under some restriction in the policy, and Hart said he ordered, or talked to me about, a policy that would cover everything, and that I told him it would."

During the trial of the cause defendant offered as a witness Albert M. Hansen, who, on direct examination, said he was assistant chief of the underwriting department of the company and passed upon applications to determine if a policy issue. He testified as follows:

"I know and was familiar with the classifications of risks in June and July 1945, and defendant did not then issue any policy to a preferred risk without the provision, 'This policy does not cover death, disability or other loss resulting from pregnancy, childbirth, or complications arising therefrom, or from any disease of organs which are peculiar to women.' * * * Q. In June and July 1945, did the company write any preferred risk policies which did not have the exclusion as set out in subparagraph (a) of paragraph 17 of Exhibit 1? A. They did not. In June and July 1945, defendant did not write any health and accident insurance policies to any type of risk which covered all types of disabilities resulting from accidents and all kinds of illnesses with no exclusions whatever."

On cross-examination by plaintiff the witness was shown such a policy as he claimed the company did not write. Note his testimony:

"In June and July 1945, defendant did issue two standard risk policies without the exclusion clauses for illnesses of, or operations on, organs peculiar to women and these particular policies gave coverage for female conditions not pregnancy, child-

birth, or miscarriage, if such conditions originated after the policy had been in force more than six months."

Such was a definite and positive contradiction of what he testified to in chief.

The court characterized his testimony as being unsatisfactory and gave an opinion that the company did then write the type of policy which the plaintiff claimed she was to get.

II. Both parties argue as to the failure of defendant to observe rule 344(4), Rules of Civil Procedure, in respect to the showing of error. Inasmuch as the case is in equity and is triable here de novo we do not think there is merit to plaintiff's claim.

III. The trial court decreed that the policy of insurance which the defendant delivered to plaintiff was not the policy which the plaintiff ordered or expected and that the same should be reformed. The question then arises as to whether the evidence sustains the trial court's finding. The burden was upon the plaintiff to establish such claim. The plaintiff does not claim that Sullivan had authority to issue the policy. He was the representative of the company, and in the eyes of plaintiff he was the company. She dealt with him and with no one else. The trial court based its decision that she was entitled to reformation upon the evidence of the three witnesses, Hart, Sullivan and plaintiff. The part reformed was set out in the court's findings of fact. Their testimony, fairly considered and in the light of the usual procedure followed in insurance matters, clearly shows what plaintiff wanted and what Sullivan, the defendant's agent, knew she wanted and represented to her she could get and was getting. While defendant argues that there were contradictions in the testimony of such witnesses, yet when closely and carefully analyzed such were not vital. Another matter which has quite an important bearing was the claim made throughout by defendant that at the time the company issued the policy to plaintiff it did not issue to women such a policy as plaintiff testified she had applied for and was promised. Its own witness does not support such claim. If the evidence on the part of plaintiff, regarding the kind of a policy promised to be issued, is to be believed we think it meets the test of being clear and convincing. In the consideration of this matter it is to be kept in mind that this is an

equitable proceeding and is triable here de novo. There is no claim of fraud so far as the solicitation of application for the policy issued to plaintiff is concerned. The claim is based upon mistake or accident.

In 76 C. J. S., Reformation of Instruments, section 30, the rule states, in part: "In order to authorize reformation, the instrument must fail to express the parties' agreement or intention, either because of mutual mistake or because of mistake, inadvertence, or accident on one side and fraud or inequitable conduct on the other." See also Wall v. Mutual Life Ins. Co., 228 Iowa 119, 289 N.W. 901, wherein we held that to entitle plaintiff to reformation such as prayed in the petition it must appear that the contract does not express the true meeting of the minds of the parties. Also, if this does not appear the contract must necessarily be controlling. The same case holds that in the construction of life insurance contracts liberal construction in favor of the assured is to be indulged in. In that case it was held there was a failure of proof.

In connection with the rules of construction to be applied in insurance contracts attention is called to our holding in the case of Lankhorst v. Union Fire Ins. Co., 236 Iowa 838, 20 N.W.2d 14. Therein this court (by Justice Mulroney) affirmed the trial court in reforming a policy of insurance under the claim of mistake. Particular attention is called to the language on page 842 as applied to the authority of the agent of the insurance company. Therein we said: "What did the insurer intend and believe? The insurer is a corporation. It acts only through agents. The policy contract was negotiated by Wood. Wood was the agent with delegated authority to negotiate in behalf of defendant. He testifies that he knew all the facts * * *." He filled out the application for the policy. The agent, as in the instant case, was cognizant of the facts—in the instant case, of the kind of policy plaintiff desired. In the cited case (on page 843) the agent who solicited the policy, when advised of the disputed matter in the policy, said: "I didn't know it [unoccupancy permit] wasn't on there for the entire year."

In the case of Fitchner & Co. v. Fidelity Mutual Fire Ins. Assn., 103 Iowa 276, 72 N.W. 530, an action in equity, the com-

14

pany contended that the plaintiff was negligent in failing to read the application which was filled out by the agent, one Doughty. We set forth the language of the court appearing on pages 279 and 280 of 103 Iowa:

"Doughty was the agent of the company, and acted in that capacity in preparing the applications. The insured ordinarily rely upon the agent to properly set out the facts in the applications, and Laub did as men usually do, in assuming that the defendant's agent had done his duty. Stone v. Insurance Co., 68 Iowa 737; McComb v. Insurance Co., 83 Iowa 247. The mere failure of the assured to read his application, or the copy of it on the policy, does not establish negligence. Bennett v. Insurance Co., 70 Iowa 600; Hagan v. Insurance Co., 81 Iowa 321; Donnelly v. Insurance Co., 70 Iowa 693; Boetcher v. Insurance Co., 47 Iowa 353. Nor is the mere omission to read the policy negligence. Barnes v. Insurance Co., 75 Iowa 11; Jamison v. Insurance Co., 85 Iowa 229; Boetcher v. Insurance Co., supra. Laub had no reason to suppose the policy and application were drawn differently than understood. As to matters affecting the rights of the firm at the time the policy was delivered, or in the future, it must be charged with notice, but the law did not require him to search through the policy to ascertain past mistakes or misstatements of the agent or company. Under the circumstances disclosed, it cannot be said that the plaintiff was negligent in failing to discover the error of the defendant and its agent."

See also Haugh v. Lanz, 187 Iowa 841, 172 N.W. 199; King v. Good, 205 Iowa 1203, 219 N.W. 517; Den Hartog v. Home Mutual Ins. Assn., 197 Iowa 143, 196 N.W. 944; Green v. Phoenix Ins. Co., 218 Iowa 1131, 253 N.W. 36.

Under the authorities the insurer is bound by the knowledge of its agent of the kind of a policy desired. There is no dispute but that Sullivan fully understood that plaintiff wanted a policy which would give her full protection for health and accident and without the female exclusion clauses. Hart and plaintiff so testified and Sullivan does not deny such knowledge. While he prepared the application, getting the information from plaintiff, she did not read it. Under our holdings she was not negligent. Bennett v. Council Bluffs Ins. Co., 70 Iowa 600, 31 N.W.

948; Hagan v. Merchants & Bankers Ins. Co., 81 Iowa 321, 46 N.W. 1114, 25 Am. St. Rep. 493; Barnes v. Hekla Fire Ins. Co., 75 Iowa 11, 39 N.W. 122, 9 Am. St. Rep. 450; Boetcher v. Hawkeye Ins. Co., 47 Iowa 253.

We have examined the various cases cited by defendant. Some are law actions and do not involve reformation. Beyer v. Central Life Ins. Co., 199 Iowa 245, 201 N.W. 577, did not involve reformation, being an action to compel issuance of a policy. The case of Rainsbarger v. Mutual Benefit Health & Accident Assn., 227 Iowa 1076, 289 N.W. 908, did not involve the question of what insurance the plaintiff wanted. Plaintiff was injured after application but before the policy issued. This court held against plaintiff.

We have not attempted to set forth herein and discuss all of the various arguments advanced by the defendant in its asking for a reversal. We have considered the various points raised and argued and have examined the authorities cited. They set forth abstract rules but their applicability to the facts and circumstances is open to question. It being an equitable action the trial court rightly sought to apply equitable rules.

We hold that the trial court did not err in sustaining plaintiff's claim for reformation. We hold that the record shows abundant facts to sustain such holding. The company, acting through its authorized agent, Sullivan, knew what insurance plaintiff desired and ordered. To her Sullivan was the company, and according to everyday business practice and custom she dealt with him and rightly so. While she admits that she did not read either the application or the policy, we hold that under our holdings she was not negligent in that respect. She thought she was getting the protection she desired; Sullivan thought so. Under the record she was entitled to receive it. The case is affirmed.— Affirmed.

All JUSTICES concur.