Hyman-Michaels Company, Plaintiff-Appellant, v. Massachusetts Bonding and Insurance Company, Defendant-Appellee, and Associated Agencies, Inc., Defendant.

**Gen. No. 46,531.**

First District, Second Division.

December 6, 1955.

Rehearing denied March 6, 1956.

Released for publication March 6, 1956.

14

Clausen, Hirsh & Miller, of Chicago, for appellant.

Kirkland, Fleming, Green, Martin & Ellis, of Chicago, for appellee; David Jacker, John M. O'Connor, Jr., and Robert H. Klugman, all of Chicago, of counsel.

JUDGE SCHWARTZ delivered the opinion of the court.

Plaintiff as beneficiary brought this suit to reform a policy of insurance issued by defendant Massachusetts Bonding and Insurance Company (Massachusetts) and to recover on the policy as reformed. The policy insured Joseph E. Michaels, Secretary-treasurer of plaintiff, in the sum of $100,000 against injuries and death by aviation accident for a period of one year commencing September 6, 1948. It was limited to accidents occurring while the insured was a passenger on any one of eighteen groups of airlines therein listed. This list included British Overseas Airways Corporation (BOAC) but not British European Airways Corporation (BEA). On February 19, 1949, Joseph Michaels was killed while a passenger on an airplane operated by BEA on a flight from London to Glasgow. Plaintiff asserts that the failure of the coverage to include BEA was the result of a mutual mistake, in that both parties intended that a policy should be issued identical in coverage with that of an expired policy issued by another company. That policy would have covered the insured while a passenger on BEA. A separate count

16

in the complaint set forth an action at law against Associated Agencies, Inc., (Associated) alleged by plaintiff to have been the agent of Massachusetts in this transaction. The chancellor ordered a separate trial on that count and transferred it to the law side of the court. He then proceeded with a trial of the issues between plaintiff and Massachusetts and at the conclusion of the evidence, dismissed the complaint for want of equity.

While there is a sharp and spirited dispute between the parties, it is not because of any important disagreement over the verity of the oral testimony or the written documents put in evidence. Rather, the dispute is over the conclusions to be drawn from the evidence, and requires a somewhat detailed statement of facts in order that the issues may be understood. Plaintiff does a worldwide business in the buying and selling of scrap metal. Its employees take plane trips to Europe, Africa and South America, as well as within the United States. Through one Jacob Weil, an insurance broker not employed by but officing and working with Associated, plaintiff in 1947 took out an aviation accident policy on six of its officers. That policy was issued by Globe Indemnity Company. It insured Joseph Michaels against death by an aviation accident *occurring anywhere in the world on any regularly scheduled passenger airline.* When that policy was about to expire, Weil informed Sheldon, an officer of plaintiff company in charge of a considerable part of its insurance business, that Globe would no longer write that type of insurance and if plaintiff wanted it "renewed," he, Weil, would have to seek it elsewhere. Upon being advised that plaintiff did desire to continue that type of insurance, Weil took the matter up with Associated for the purpose of finding another insurer.

Associated is an incorporated general insurance agency. For many years it had handled a great deal of plaintiff's insurance business. Its president and some

17

of its other officers for a long period of time had cordial business and social relations with plaintiff's officers. Bernard W. Roos, its vice-president, had charge of aviation accident insurance. He handled the issuance of both the Globe and the Massachusetts policies. He also countersigned the policies on behalf of Associated, as required under the terms of the transaction, before the policies were made effective. Through Roos, Weil obtained application blanks for a new insurance policy to be issued in an underwriting group known as United States Aviation Underwriters (USAU). This was an aggregation of twelve insurance companies, including Massachusetts, sharing ratably in premium receipts and in loss payments. Original applications, premium payments and loss claims were processed through USAU. Late in August, 1948, seven applications were given to Sheldon, one to be signed by the company for group insurance, and one for each of six employees to be insured. These were duly executed and returned to Massachusetts. Policies were then issued together with an "Airsurance Agreement."

The employer's application signed by plaintiff company by J. E. Michaels was entitled "Group Plan Airsurance." The group of twelve insurance companies was listed therein and a check mark placed opposite the name "Massachusetts." It listed the employees to be insured and the amount of coverage for each. The application contained a statement of what Group Plan Airsurance was. From this it appeared that two types of insurance were offered—basic and extended coverage. Basic insurance was limited to certain enumerated airlines, including BOAC, but excluding BEA. Extended coverage was defined as all the coverage provided for under basic insurance and, in addition, covered the insured while a passenger on a civil aircraft operated by any scheduled air carrier over its regularly established route. The basic rate was shown

18

as $1.10 per thousand, and extended coverage as $2.70 per thousand.

The employees' applications, including the application of Joseph Michaels, were also signed and returned. These were headed "Group Plan Airsurance" and at the top contained two items, one entitled "Basic Airsurance," and the other, "Passenger Extended Coverage." A definition of the respective coverages was shown in each item, maintaining the distinction we have described. The difference in rate was also shown, that is, $1.10 for basic, and $2.70 for extended coverage. Alongside each definition a square was provided in which the type of coverage selected by plaintiff could be shown by a check mark or an "X." The application signed by Joseph Michaels shows a check mark in the square opposite the item "Basic Airsurance." Plaintiff produced evidence to show that the mark was not placed there by the insured. It is conceded that no mark was placed in the square opposite "Passenger Extended Coverage" by anyone.

The "Airsurance Agreement" is a formal document, duly executed by USAU and by Hyman-Michaels Co., by E. B. Michaels, president. It is plainly written and relatively short. It provides for group insurance and states that plaintiff has agreed to submit applications covering five or more of its employees. The longest paragraph in the instrument is No. 4 which provides for the issuance of insurance on additional employees who make application. In that paragraph it is also stated that a policy issued pursuant to the agreement shall afford only basic airsurance coverage unless the application card referred to specifically indicates that "Passenger Extended Coverage" is desired.

The policy in question contains this legend across its face in capitals: "THIS IS A LIMITED POLICY READ IT CAREFULLY." At the top of page 2 is a heading "Aviation Accident," following which is a

19

statement that the term means an accident occurring anywhere in the world and causing death or bodily injury to the insured while: "(a) A passenger in . . . any civil aircraft . . . operated by: . . ." and under this there are eighteen distinct items outlining in alphabetical order the airlines or groups of airlines covered by the policy. Item 7 is shown thus: "(7) British Overseas Airways Corporation (BOAC)." BEA, if it had been included, would in alphabetical order have been listed immediately before this. This paragraph takes up about half a page of the policy.

In addition to the documents we have described, there were items of correspondence between Weil and plaintiff in which Weil referred to the "renewal" of plaintiff's "Aviation Accident policy," and there is also a letter in evidence in which plaintiff refers to the "employer's application for the renewal of our Aviation Accident policy."

■■ In analyzing the evidence we have in mind that in a suit to reform a written contract, a plaintiff is not merely seeking to rescind or avoid the contract but is seeking to enforce a contract different from that which he has signed. He must therefore be able to point to the contract he intended to make. Moreover, he must prove a like intention on the part of the defendant. In other words, both defendant and plaintiff must have had the intention to make the same contract, but failed to do so by each making the same mistake. These general principles are recognized in our decisions and are not disputed. Harley v. Magnolia Petroleum Co., 378 Ill. 19, 27, 28, 37 N.E.2d 760, 765; Biskupski v. Jaroszewski, 398 Ill. 287, 293, 294, 76 N.E.2d 55, 58, 59; Anderson v. Pettigrew Foundry Co., 297 Ill. App. 14, 23, 17 N.E.2d 60, 63. Since reforming a written contract qualifies the general principle that persons who execute contracts are presumed to know what is contained therein, courts have held that proof of mistake must be "clear and convincing." Biskupski

20

v. Jaroszewski, 398 Ill. 289, 293, 76 N.E.2d 58; Harley v. Magnolia Petroleum Co., 378 Ill. 19, 27, 37 N.E. 2d 760, 765; Du Teau Co. v. New Hampshire Fire Ins. Co., 156 Neb. 690, 57 N.W.2d 663.

■ To make its case plaintiff must prove three propositions: (1) that Associated was the agent of Massachusetts in its dealings with plaintiff; (2) that plaintiff understood and intended to obtain through Associated a policy having coverage identical with that provided in the previous Globe policy; and (3) that Associated likewise understood and intended that such a policy would be issued by Massachusetts. We must also keep in mind that a reviewing court will not reverse on issues of fact unless the decree is against the manifest weight of the evidence. Kinnah v. Kinnah, 184 Ill. 284, 56 N. E. 376; Baker v. Baker, 6 Ill.App.2d 557, 128 N.E.2d 616, and cases there cited.

■ We will first consider whether Associated was the agent of Massachusetts or, more precisely, whether Associated's knowledge of an alleged intention on the part of plaintiff to procure a given type of policy could be attributed to Massachusetts. The Insurance Act in effect at the time defined an agent as "any person, partnership, association or corporation, who or which solicits, negotiates or effects in this State, on behalf of any company, contracts for insurance of any of the following kinds, namely: Life, Accident, Health, Casualty, Fidelity, Surety, Fire and Marine." (Ill. Rev. Stat. 1947, Ch. 73, Par. 588 [Jones Ill. Stats. Ann. 66.125(2)].) The evidence tended to show that Associated, although regarded as Massachusetts' "general agent" for certain other lines of insurance, was not regarded as having that status with respect to aviation insurance. Associated did not keep blank Massachusetts policies but ordered them from USAU. On the other hand, the evidence was not clear as to what arrangement for commissions existed between Massachusetts and Associated or as to the disposition of the premium

21

check which Associated received from plaintiff. Under some circumstances a broker purporting to represent an insured will be considered an agent of the insurer even though he was not a regular or licensed agent of the insurer. (See Boston Store of Chicago v. Hartford Accident & Indemnity Co., 227 Ill. App. 192; Moone v. Commercial Casualty Ins. Co., 350 Ill. App. 328, 112 N.E.2d 626.) In the instant case the president of Associated testified that he had authority to countersign the policy issued. In our opinion a prima facie case of agency was established. However, we cannot say that the finding of the chancellor to the contrary was against the manifest weight of the evidence. (Cf. Mac-Donald v. Milwaukee Mechanics' Ins. Co., 167 F.2d 276; Indemnity Ins. Co. of North America v. Midwest Transfer Co., 184 F.2d 633.) Assuming that Associated was the agent of Massachusetts, we will consider the second and third issues involving the mutuality of mistake.

As to the second issue, the documents involved in the transaction unequivocally point to a type of coverage unlike the Globe policy. That policy covered six of plaintiff's named officers, including Joseph Michaels. Three of these were listed under "Group I," covering aviation accidents occurring in the United States and Canada within 150 miles of the United States border while on a regularly scheduled airline holding a certificate of public convenience and necessity from the Civil Aeronautics Board (CAB). Three of the employees were in "Group II," which insured against accidents occurring on flights made on an aircraft operated anywhere in the world on a regularly scheduled passenger trip over its established route. Joseph Michaels was included in Group II. The premium was computed at 80 cents per thousand for Group I, which had a total coverage of $170,000, and $1.10 per thousand for Group II, which had a total coverage of

22

$250,000. The total premium paid was $425.25, being $411 plus $14.25 for certain medical benefits. The Massachusetts policy covered the same six officers. Each was insured in the same amount as under the Globe policy. The Massachusetts policy issued on the life of Joseph Michaels covered accidents occurring anywhere in the world while the insured was a passenger on any civil aircraft operated "by an American flag scheduled air carrier holding a Certificate of Public Convenience and Necessity issued by the USCAB," or by any one of seventeen named foreign flag companies. It is conceded that the policies issued on the other employees of plaintiff were identical. It thus appears that while the Massachusetts policy was more limited than that issued by Globe as to the Group II category, in that it included only a limited number of foreign airlines, it provided a greater coverage for those employees who had formerly been insured under the Globe policy in Group I. The premium on the Massachusetts policy was computed at the rate of $1.10 per thousand, the total coverage being $420,000. This amounted to $478.80, which included $16.80 for medical benefit. This compares with eighty cents for Group I and $1.10 for Group II, making a total of $425.25, in the Globe policy. Thus, it appears that certain differences in rate as well as coverage between the two policies were clearly observable. The applications and the airsurance agreement also revealed a coverage different from that provided by the Globe policy.

██ ██ Plaintiff, however, relies on the contention that none of its officers read either the policy or the other documents. And plaintiff urges upon us that courts have recognized that the business of insurance is intricate and complex; much more so than is necessary, counsel argues, and that this tends to confuse the insured so that few, if any, people ever read an insurance policy or the documents relating thereto.

23

Therefore, it is argued, this court should take into account the realities of the situation and, in substance, give little heed to the actual contents of the policy or auxiliary documents, but enforce the real intent of the parties. It is true that courts have probably gone farther in this direction with respect to insurance policies than in any other field, and have held that failure to read a policy does not bar a suit to reform. German Fire Ins. Co. v. Gueck, 130 Ill. 345, 23 N. E. 112; Anderson v. Pettigrew Foundry Co., 297 Ill. App. 14, 17 N.E.2d 60; Stoltz v. National Indemnity Co. of Omaha, 345 Ill. App. 495, 104 N.E.2d 320; Quinn v. Mutual Benefit, Health & Accident Ass'n of Omaha, 244 Iowa 6, 55 N.W.2d 546. Courts do not from this proceed to a reductio ad absurdum that the parties' written agreements have *no* weight. There must be limitations on the extent to which courts will ignore the provisions of even insurance contracts. At one time parties were bound absolutely and literally to the written contract. The word was supreme, whether in contract or statute. It was inconceivable that one should seek a meaning or intention apart from the written document. No heed was given to human fallibility. The emphasis was on the futility of any attempt to find the intention of the parties apart from their written expressions. Gradually, the injustice of the application of such a rigid rule to particular cases caused the courts to inquire into intention and to reform mistakes. Failure to read is not a bar to a suit to reform, but courts are not thereby excluded from consideration of other circumstances such as the nature of the transaction, the position and experience of the parties and the clarity and conspicuity of the writing itself. Failure to read the documents in this case did not involve oversight of a word, a phrase, or a line. It was failure to read an entire set of documents. Plaintiff's officers had not read the Globe policy before the negotiations leading to

24

issuance of the Massachusetts policy. Without knowledge of the contents of the Globe policy there could be no claim of an intention to obtain a new policy in a new company identical in its coverage. Plaintiff argues that it had a correct understanding of the Globe policy and that it is immaterial whether any of its officers had actually read the policy. It is true that failure to read would not be an absolute bar to a suit to reform but the chancellor in reaching a decision could properly take into account that plaintiff's officers, men of experience in such affairs, had failed to read not one but two policies; that if they had examined the Globe policy they would have seen there were limitations on the "world-wide" coverage even in that policy, and a cursory examination of the new policy would have revealed the substantial differences between the two. The evidence offered by plaintiff fell short of establishing that plaintiff had a definite intention to obtain a continuation of the kind of coverage which it then knew it possessed.

The evidence is even less convincing that Associated likewise mistakenly ordered and delivered to plaintiff a policy of coverage different from that of the prior Globe policy. Here, if we accept plaintiff's position, we must assume that Roos, an experienced insurance man, did not observe that there were two types of coverage—basic and extended—to be obtained from Massachusetts and did not observe the difference in rates between them, all of which appears implausible to us in view of the conspicuity and clarity of the differences in coverage and rates. The first item of evidence stressed by plaintiff to show Massachusetts' intention to provide the same coverage in the new policy as in the old is that the old Globe policy file of Associated was stamped "Renewed." This, it is argued, means renewed in a different company, to be sure, but with the coverage identical to the old. In construing

25

an ambiguous word like renewed, we could under other circumstances give it the meaning plaintiff urges upon us. But here it may be argued with equal force that to men in the insurance business whose direct and immediate interest was in the continuation of the premiums out of which they receive commissions, the word renewal means that the business has been kept or retained. This is what the president of Associated testified to, and it so appears to us. In stamping the file "Renewed," Roos was doing no more than making an inter-office memorandum. We cannot attach to that memorandum such significant meaning as plaintiff does.

It is next argued that the insurance ordered was at the rate of $1.10 per thousand, that this was the same as the Globe rate, and therefore Roos must have thought he was obtaining coverage for the plaintiff equivalent to that under the Globe policy. The Globe policy rates, as we have heretofore pointed out, were $1.10 for Group II and *80 cents* for Group I, so that there was a substantial difference between the rates in the two policies. Still, the argument might have some force if the rate of $1.10 was not a rate used by Massachusetts for a type of air accident coverage. But Massachusetts did have that rate for its basic coverage. It seems equally reasonable, therefore, to assume that Roos ordered insurance at that rate because it was the rate Massachusetts charged for basic insurance. Perhaps Roos was influenced by the fact that this rate was closer to the sum plaintiff was spending for aviation accident insurance than the extended coverage rate. In any event, the chancellor had ample reason in the evidence for concluding that Roos knew what sort of policy he was obtaining for plaintiff.

No decision in this state has been found in which reformation was granted on such meager evidence. In cases where reformation has been allowed there has been a clear showing of what the plaintiff intended to

procure and of the defendant's knowledge of that intention, either by express directions from the insured or by knowledge of circumstances wholly inconsistent with the provisions of the policy. (Keith v. Globe Ins. Co., 52 Ill. 518; Home Insurance & Banking Co. v. Myer, 93 Ill. 271; Stoltz v. National Indemnity Co., 345 Ill. App. 495, 104 N.E.2d 320; Cf. German Fire Ins. Co. v. Gueck, 130 Ill. 345, 23 N. E. 112; Beddow v. Hicks, 303 Ill. App. 247, 25 N.E.2d 93; Blumenfeld v. Neuman, 350 Ill. App. 306, 112 N.E.2d 742; Tri-City Transp. Co. v. Bituminous Casualty Corp., 311 Ill. App. 610, 37 N.E.2d 441.)

Neither do the decisions of the courts of other states support plaintiff's case. Plaintiff relies heavily on Martin v. American Ins. Co., 198 Wis. 214, 223 N. W. 437. There it appeared that a rider with respect to temporary vacancy attached to the original policy was changed in the renewal of the policy. Reform was granted on a showing that the insured left her policies with the agent of the insurer; that from time to time she asked and paid for renewal; that the insured did not see the policies and was never notified of any change. The *agent himself* testified that he intended to provide the same coverage as was originally had. On that basis the court granted reformation.

In Quinn v. Mutual Benefit, Health & Accident Ass'n of Omaha, 244 Iowa 6, 55 N.W.2d 546, reform was allowed when it appeared that the insurer's agent and the insured agreed as to what was intended to be covered by the policy. In Du Teau Co. v. New Hampshire Fire Ins. Co., 156 Neb. 690, 57 N.W.2d 663, where the agent and the insured disagreed as to whether the insured received the policy he wanted, reformation was denied.

██ ██ Several assignments of error charged erroneous rulings of the court with respect to the exclusion of evidence. These all related to the second issue, that is, whether *plaintiff intended* to obtain a policy from

27

Massachusetts having coverage identical with that provided in the Globe policy. It has no bearing on the other issues—that of the agency of Associated, and whether Massachusetts understood and intended that plaintiff should have such a policy. However, we will consider these errors. The first charged is that the court erroneously admitted the contents of a pre-trial deposition given by Weil, who died before the case came to trial. The court sustained an objection to the admission of his deposition but permitted defendant to examine Everett Michaels with respect to its contents. The defendant concedes that the hearsay rule bars the use of Weil's statement, but argues that the evidence was offered only to show that Weil had made such statement. It is difficult to see how the statement without consideration of the contents thereof is of any value. In our opinion the court should have excluded this testimony, but under the circumstances it is not reversible error. It has no bearing on the issue of whether Massachusetts understood and intended that plaintiff should have a policy with the same coverage as that of the old Globe policy.

It is next argued that the court erroneously admitted into evidence Joseph Michaels' individual application for insurance. The basis of the objection is that the application had not been attached to the policy and that the admission into evidence of an unattached application is forbidden by Section 360 of the Insurance Code of 1937 (Ill. Rev. Stat. 1949, Ch. 73, Par. 972 [Jones Ill. Stats. Ann. 66.1035]). This section was in effect when the policy was issued. Defendant points out that Section 360 was repealed in 1951, before this case was brought (Illinois Laws 1951, p. 611, Sec. 2) and that the section now applicable is Section 359a (Ill. Rev. Stat. 1953, Ch. 73, Par. 971a [Jones Ill. Stats. Ann. 66.1034(1)]) which does not exclude the application as evidence, but provides that the insured shall not be bound by the statements therein. Plaintiff ar-

gues that this involves a "vested right" and hence the statute in effect at the time the policy was issued applies. We think it is clear that this involves a rule of evidence and that the latter statute applies. People v. Lindheimer, 371 Ill. 367, 373–4, 21 N.E.2d 318, 321; Holcomb v. Boynton, 151 Ill. 294, 297, 37 N. E. 1031, 1032. The statutes in question were designed to prevent an insurer from avoiding a policy on the ground of misrepresentation made in an unattached application. (See e. g. Lampke v. Metropolitan Life Ins. Co., 279 N. Y. 157, 18 N.E.2d 14; Kirkpatrick v. London Guarantee & Accident Co., 139 Iowa 370, 115 N. W. 1107.)

 In the instant case the application was not introduced to show representations made thereon by the applicant, but only to show what was printed thereon by the insurer. The application contained no limitations or conditions which were not contained in the policy itself. Plaintiff's argument against admissibility rests largely on the proposition that the application showed on its face an apparent election of basic coverage by the applicant and that this election had not, in fact, been made by the applicant but by an employee of USAU. Assuming this fact to be true, the application was nevertheless relevant and admissible. (See Saunders v. Agricultural Ins. Co., 167 N. Y. 261, 60 N. E. 635.) It would still show that the insured made no election (which under the agreement was deemed to be an application for "basic") and it also was relevant to the question of what Massachusetts understood to be the intention of the insured.

 It is next contended that the court erred in excluding evidence by way of an express statement from one of plaintiff's officers that plaintiff intended to renew the Globe policy. In an action to reform a contract parol evidence of intention is admissible. Ewing v. Sandoval Coal & Mining Co., 110 Ill. 290; McLennan v. Johnston, 60 Ill. 306, 311. This is an ex-

ception to the general rule that belief, conclusion and intention are not admissible in civil actions. It was in reliance on this principle that counsel for plaintiff asked its president:

"Q.—what was the intention of Hyman-Michaels Company with respect to the continuation of the insurance which it had in 1947?"

The court sustained an objection to this question. A corporation speaks through its duly authorized employees. In effect therefore the president of plaintiff company was asked to testify to the state of mind of all the officers who represented the company in insurance matters. This clearly was of no value. In any event it had a bearing on only one of the necessary elements to make plaintiff's case and would not be reversible error.

 Plaintiff objects that its offer to prove a long course of insurance dealings with Associated was rejected by the court. Plaintiff has quite definitely proved by evidence already in the record that it had extensive business and social associations with officers of Associated. The court's ruling sustaining objection to a tender of invoices for insurance of various kinds with plaintiff's checks in payment and a collective exhibit covering a ten-year period of their transactions was not erroneous.

Plaintiff assigns error on the ruling of the trial court's dismissal of Counts 1, 2, 6 and 7. In its brief, however, plaintiff says, "If there is to be a new trial, these counts should be reinstated." By this we understand a ruling is desired on this point only if the judgment is reversed and the cause remanded for new trial and there is therefore no need for us to pass upon the question.

Decree affirmed.

McCORMICK, P. J. and ROBSON, J., concur.