**BROWN TOWNSHIP MUTUAL INSUR-ANCE ASSOCIATION, Appellee,**

v.

**Russell L. KRESS and Kress Manufacturing, Inc., Appellants,**

and

**The McCright Agency, Inc., Ronald L. Doyl, and Martin P. Lang, Appellees.**

No. 65547.

Supreme Court of Iowa.

Feb. 16, 1983.

Rehearing Denied March 10, 1983.

Lloyd E. Humphreys of Humphreys & Associates, Cedar Rapids, for appellants.

James F. Pickens of Pickens, Barnes & Abernathy, Cedar Rapids, for appellee Ins. Ass'n.

William H. Carmichael of Simmons, Perrine, Albright & Ellwood and Donald J. Ibeling, Cedar Rapids, for appellees McCright and Doyl.

Ronald W. Wendt of Nazette, Hendrickson, Marner & Good, Cedar Rapids, for appellee Lang.

Considered by REYNOLDSON, C.J., and LeGRAND, UHLENHOPP, HARRIS and McCORMICK, JJ.

UHLENHOPP, Justice.

This appeal requires us to define the rights and liabilities of an insured and an insurer under a fire policy covering property which the insurer was not statutorily authorized to insure.

Ronald L. Doyl was an agent for The McCright Insurance Agency. Russell L. Kress contacted him in July 1972 about obtaining fire insurance coverage. Doyl visited with Kress at the latter's home to ascertain the type of coverage Kress needed. At that time, Kress was operating a machine shop in the rear portion of his home. Doyl observed tools, supplies, and large industrial-type machines. He learned that Kress had employees and that the shop provided machined parts to Cedar Rapids industries, and he saw the premises as a commercial venture. Doyl told Kress he would have to check with various insurance companies to see if a fire risk could be written for the premises and to ascertain the premiums. Kress was interested in obtaining inexpensive insurance coverage, and Doyl thought Brown Township Mutual Insurance Association (BTM) could provide the lowest premium.

Doyl called Martin P. Lang, BTM's secretary-treasurer, to see if that association could write a policy covering Kress's property for fire loss. Doyl and Lang are in dispute as to what was actually said, but in any event Lang did tell Doyl that a policy could be written and that BTM had written similar policies in the past.

Because of Lang's assurance and BTM's favorable rate, Doyl secured fire insurance coverage for Kress with that association. Attached to Kress's application was an inventory of his equipment. BTM issued a policy to Kress after penciling in the words "and shop" on the application. The policy had a limit of $12,000 on the building and $6000 on household goods, and a blanket limit of $29,500 on personal property.

Kress's business grew. As Kress added machinery and enlarged his facilities, he had Doyl change the insurance three times. The first change increased the blanket personal property limit by $15,000 to $44,500 and the second increased it $2500 to $47,000. The third change shifted the coverage on household goods to blanket personal property coverage, which increased that limit to $53,000. The reason for this change was that Kress moved into a trailer home which was not part of the insured premises.

As Kress's business expanded, he incorporated it to facilitate an application for a Small Business Administration loan. Assets covered by BTM's fire insurance policy were transferred to the newly-created Kress Manufacturing, Inc. (KMI). Kress continued to maintain the insurance, however, in his individual name.

Kress began to experience financial difficulties, and SBA turned down his application for another loan. On December 24 and 25, 1974, Kress's shop and contents were destroyed by fire. Doyl and Lang visited the premises within the next few days, and shortly thereafter an adjuster from BTM's reinsurer, Iowa Mutual Tornado (IMT), also inspected the site. The IMT adjuster advised BTM to pay Kress $12,000 for damage to the building but nothing for damage to personal property. BTM accordingly paid Kress $12,000. Kress filed proof of loss with BTM on the personal property, but BTM did not pay that loss.

On January 19, 1975, BTM cancelled Kress's policy and refunded unearned premiums. BTM retained the premiums for coverage during the period up to and including the fire.

BTM brought the present declaratory judgment action against Kress and KMI seeking to establish that it had no liability under the insurance policy and asking that the sum of $12,000 previously paid be returned. Kress and KMI denied BTM's petition and counterclaimed against BTM for $53,000 additional they claimed was due under the policy. They also sought consequential damages, punitive damages, and attorney fees for delay in payment. Other claims were filed by various parties, which we need not relate.

A separate trial was held with respect to BTM's declaratory judgment action and the counterclaim of Kress and KMI. The trial court denied KMI recovery but found that Kress was entitled to keep the sum of $12,000 already paid and to receive an additional $47,891.34 for loss of personal property. The remaining claims were then separately tried. The trial court denied the counterclaim of Kress and KMI for consequential and punitive damages and attorney fees and their claims against Doyl and The McCright Agency for negligence. The court also denied various claims for indemnification among BTM, Doyl, The McCright Agency, and Lang.

BTM, Kress, and KMI appealed. Doyl, The McCright Agency, and Lang moved to dismiss the appeals as to them, pointing out that Kress and KMI raised no issues against them on appeal. Kress and KMI resisted the motion to dismiss because of potential indemnification rights among BTM, Doyl, McCright, and Lang. At oral argument, however, BTM dismissed all its cross-appeal issues against Doyl, McCright, and Lang including the indemnification issues. Therefore no issues on appeal are directed against Doyl, McCright, and Lang. Their motions to dismiss are granted. *See* Iowa R.App.P. 14(a)(3). We thus proceed to the issues presented in this court.

■ The case was tried to the trial court by ordinary proceedings. Its findings have the effect of a jury verdict and will not be disturbed on appeal if they are supported by substantial evidence. *Public Finance Co. v. Van Blaricome,* 324 N.W.2d 716, 718

(Iowa 1982); *State v. Hall,* 287 N.W.2d 564, 565 (Iowa 1980).

■ I. *Validity of policy—ultra vires.* BTM claims the policy issued to Kress is void because BTM, as a mutual insurance association, was not authorized to write insurance on commercial property; therefore the policy is ultra vires. The only kinds of property which county mutuals may insure are listed in section 518.12 of the Iowa Code of 1981 (the same statute since 1966):

1. Farm property, including residences and other farm buildings and all classes of personal property in connection therewith;

2. Buildings and personal property used in the processing of agricultural products in conjunction with a farming operation;

3. City and suburban residences, including household and personal effects;

4. Churches, schools and community buildings.

The personal property destroyed did not come within these classes.

Kress and KMI claim, however, that BTM is estopped from relying on ultra vires because BTM knew the nature of Kress's business but issued the policy and accepted the premiums anyway.

The testimony at trial on this issue was conflicting. Doyl testified he knew Kress's facilities were commercial in nature and relayed that information to Lang:

Q. On your direct examination you stated you called Martin Lang on or about July 6, 1972 to inquire whether or not Brown Township could write this policy. What did you tell Mr. Lang over the telephone? A. I told him that Russell had contacted me, I had been to his premises and viewed them, told him what his operation consisted of, the size—

Q. It is important from your standpoint that you be very specific. You said you told him what his operation consisted of. Exactly what did you tell Mr. Lang? A. I told him that he had—Russell had a building, he was living in one end, in the other end he had a shop in which he had

several large industrial lathes, milling machines, drill presses, etc., and that he was doing piece work for companies here in Cedar Rapids.

Q. What else did you tell him? A. Told him that he had a couple part-time employees. We discussed the size of the building, discussed how we would rate—first of all I told him that the building was not specifically rated, that it was located outside the city limits, and asked him if he would consider writing the risk.

Q. When you were there on the 6th of July did you see everything in front of you? A. You mean did I observe the machines, the building?

Q. Did you do that? A. Yes.

Q. And did you describe what you saw to Mr. Lang on the telephone? A. Yes.

Q. Now you said you described or told him that he was living in one end and had a shop in the other end? A. Yes.

Q. And you also described the size of the building to him, I think you said? A. Yes.

Q. That would be 32 by 60 and 12 by 14? A. Correct.

Q. Did you estimate the percentage of the building used for shop and percentage used for personal dwelling? A. Yes.

Q. Which was what? A. Approximately 80% shop; 20% dwelling.

Q. Did you tell Mr. Lang there was quite a supply of tools and supplies on the premises? A. Yes.

Q. Did you tell him there were five or six large industrial lathes? A. Yes.

Q. Drill presses? A. Yes.

Q. Milling machines? A. Yes.

Q. And other types of machinery? A. Correct.

Q. Did you say anything to Mr. Lang about this was part of a farm or farming operation? A. No.

Q. Do you recall using to Mr. Lang on the phone the words "industrial" or "manufacturing"—excuse me, "commercial" or "industrial"? Do you recall using those words to Mr. Lang on the telephone? A. I am sure I probably used

"industrial". Industrial type lathes, in that context, yes.

Q. Did Mr. Lang ask any questions to you concerning your use of the property? A. I can't recall any, no.

Q. Now Mr. Doyl, you testified you are familiar with farms and farming, at least in this part of Linn County and Buchanan County, Iowa. Have you ever known a farmer in your experience to possess any machinery even similar to this? A. No.

Q. Was there any question in your mind whatsoever on July 6, 1972, and at any time after that, that Mr. Kress was conducting as a practical matter a machine shop there? A. No.

Q. And he was manufacturing parts such as we have in Exhibit "120"? A. Correct.

Q. Did Mr. Lang tell you on July 6th in that telephone conversation that they had other commercial risks that were similar to this? A. As I recall he said, "I have several risks of that type."

On the other hand, Lang testified as follows:

Q. Mr. Lang, would you please tell the Court what was the first contact you, or to your knowledge anybody at the home office of Brown Township, had with respect to what eventually led up to the issuing of the insurance policy to Russell Kress? A. On or about the 5th or 6th day of July, 1972, I received a phone call from Ron Doyl.

Q. You recognized his voice? A. Yes, I did. Yes.

Q. What did he say? A. He told me that he had a man that lived on 10 acres of ground north of Quasqueton, that he had a full time job in Cedar Rapids, he had a house that he lived in and in the back end of that house he had a shop that he had some machines in, that he did hobby work, or to that effect, after he got home from work evenings. This is the first contact I had with him.

Q. Did he say anything about Mr. Kress having any employees? A. No, he didn't.

Q. Did he say anything about him having—doing subcontract work? A commercial venture? A. No, he did not.

Q. To your knowledge had Brown Township written any other policies or had any other policy applications before that time from Mr. Kress? A. Not to my knowledge.

Q. Do you know even if Mr. Kress' name was mentioned by Mr. Doyl, or was it—A. I don't recall that the name was mentioned.

Q. Did he mention about the building being, quote, "not rated" unquote? A. Yes, he mentioned that.

Q. What is the significance of that, Mr. Lang? A. The Fire Inspection Bureau for the State of Iowa goes out and rates buildings at the request of the insured or the request of an agent, to state what fire rate they should be charged on that particular building.

Q. What would the significance that it is not rated mean? A. The insured or no agent had evidently asked for it to be rated, and normally this is done in cities and towns. If it is in the country you use an abstract rating. We have a book we use to rate a commercial risk.

Q. What do you mean, "commercial risk"? Is this for the other companies you write for? A. Yes.

Q. Let me give an example. Say you wrote for Travelers and they had a hazard insurance policy, could Travelers write a hazard insurance policy on this particular building? A. Yes.

Q. What was the purpose of Mr. Doyl's call to you, what did he tell you it was? A. He wanted to know if we could write the coverage on this particular risk that he explained to me.

Q. What did you tell him? A. I told him we could if the guy was working in Cedar Rapids and this was just a small shop and a hobby in the back of his residence, there would be no problem.

Q. Do you in fact have policies with insureds who have shops for their own use? A. Yes, we do.

Lang also testified that had he known the true nature of Kress's facilities, he would not have agreed to write the risk because it was commercial in nature.

The trial court found that BTM, acting through Lang, did know the true nature of Kress's business and did not believe it was just a hobby. Substantial evidence supports that finding. In addition to the testimony, the inventory list attached to Kress's application and the substantial increases in limits listing new machinery indicate Lang and BTM must have known Kress was carrying on more than a hobby.

The general rule is that

[T]he issuance of an insurance policy constitutes a waiver of a known ground of invalidity.

. . . .

The issuance of a policy with knowledge on the part of the company that a prohibited occupancy or use of the insured premises is had ... constitutes a waiver or estoppel.

45 C.J.S. *Insurance* §§ 725a, 726e (1946). Appelman states:

Where the insured fully performed the terms of a contract of insurance, and the insurer had received and retained a premium paid, the latter cannot evade performance on the ground that the contract was ultra vires.

. . . .

It would be improper for the insurer to be permitted to defend upon the ground of its own lack of power to enter into a contract when it has received all the agreed benefits thereunder.

16C *Appelman, Insurance Law and Practice* § 9142 (1981). Kress's premiums on the policy were current at the time of the fire and the premiums to that time were never refunded by BTM.

The decisions support the claim of Kress and KMI that BTM is estopped from asserting ultra vires. In one case a mutual insurance company was held estopped to claim ultra vires on a policy insuring rural property even though its articles of incorporation stated it could only insure city property. Because the insurer had accepted the pre-

miums and later collected assessments, the court found the policy valid. *Garner v. Mutual Fire Insurance Co.,* 86 N.W. 289 (Iowa 1901). In another case the insured had explicitly asked for a policy which would not exclude coverage for gynecological disorders. The insurance agent testified he had checked with the insurer to make sure such coverage could be included in the policy, and was so assured. Testimony showed the insurance policy was not so written by the insurer, but the court reformed the policy to provide coverage. *Quinn v. Mutual Benefit Health and Accident Ass'n of Omaha,* 244 Iowa 6, 15, 55 N.W.2d 546, 551 (1952). *See also Cornett v. Farmers' Mutual Fire Insurance Ass'n,* 208 Iowa 450, 454, 224 N.W. 524, 526 (1929) (when policy contains condition which renders it void at inception and that fact is known to insurer, insurer waives the condition by receiving premium and issuing policy); *Travelers Indemnity Co. v. Holman,* 330 F.2d 142 (5th Cir.1964); *Parmet Homes, Inc. v. Republic Insurance Co.,* 111 Mich. App. 140, 314 N.W.2d 453 (1981); *Hayes Truck Lines, Inc. v. Investors Insurance Corp.,* 269 Or. 565, 525 P.2d 1289 (1974).

Kress believed he had coverage. He did not know that insuring a commercial venture was beyond BTM's authority and he relied on its apparent authority to issue the policy. We uphold the trial court's decision that BTM is estopped to assert ultra vires.

■ II. *Change of title.* BTM claims also that the policy is void because Kress transferred the property to KMI without BTM's approval. The policy states: "Assignment of this policy shall not be valid except with the written consent of this Association." It also stipulates: "This entire policy shall be void if, whether before or after a loss the insured has willfully concealed or misrepresented any material fact or circumstance concerning the insurance or the subject thereof, or the interest of the insured therein, or in case of any fraud or false swearing by the insured relating thereto."

Kress did not conceal the incorporation of his business. On the contrary, he discussed it with Doyl. Kress was majority stockholder of KMI and controlled it; his father owned a small percentage of the stock. As controlling stockholder and as guarantor of the SBA loan to KMI, Kress had an interest which remained largely unchanged for practical purposes.

BTM insists that Kress did not have an insurable interest in the property. An insurable interest is of course essential to the validity of a property insurance policy. *Farmers Butter and Dairy Cooperative v. Farm Bureau Mutual Insurance Co.,* 196 N.W.2d 533, 536 (Iowa 1972). This court has said a person has an insurable interest when he will suffer a loss by destruction of the insured property. *McWilliams v. Farm and City Mutual Insurance Ass'n,* 248 Iowa 233, 236, 80 N.W.2d 320, 322 (1957). Corporate stockholders have been held to possess an insurable interest in corporate property. *Warren v. Davenport Fire Insurance Co.,* 31 Iowa 464, 468 (1871); *Agency Management Corp. v. Green Acres Realty,* 286 So.2d 465, 467 (La.App.1974); *Bergeron v. Fontaine,* 109 N.H. 370, 372, 256 A.2d 656, 658 (1968). A court has held that a named insured had an insurable interest in corporate property where he was the personal guarantor on the corporation's SBA obligation. *Cincinnati Insurance Co. v. Palmer,* 297 So.2d 96, 98 (Fla. of App.1974). The trial court correctly found an insurable interest in Kress as an individual.

BTM claims that the policy was voided by an unapproved assignment of it to KMI. This claim is without merit. KMI was never listed as a named insured, and no assignment of the policy from Kress to KMI was ever made. We hold that KMI has no legitimate claim to the insurance proceeds, and that judgment was properly entered in favor of Kress individually.

III. *Coinsurance clause.* BTM urges us to find the amount awarded to Kress is excessive in view of the coinsurance clause in the policy. That clause, which applies only to the blanket personal property coverage, states in relevant part:

In consideration of the rate and/or form under which said Endorsement is written, it is expressly stipulated and made a condition of this contract that the insured shall at all times maintain contributing insurance on the property covered by this endorsement to the extent of 80% of the actual cash value at the time of the loss, and that failing to do so, the insured shall to the extent of such deficit bear his, her or their proportion of any loss.

Coinsurance is defined as

a relative division of the risk between the insurer and the insured dependent upon the relative amount of the policy and the actual value of the property insured thereby. Coinsurance clauses in substance require the insured to maintain insurance on the property covered by the policy in a certain amount, and stipulate that upon his failure to do so, the insured shall be a coinsurer and and bear his proportionate part of the loss on the deficit. In short, such clauses are designed to compel the insured, as a self-insurer or otherwise to carry insurance on the risk in an amount equal to the percentage of its value fixed by the particular clause.

44 Am.Jur.2d *Insurance* § 1510 (1982). *See* Iowa Code § 515.111 (1973).

■ BTM pled the coinsurance clause in its answer to Kress's counterclaim and at trial introduced evidence of the value of the insured property. As a general rule, the potential limitation of liability due to a coinsurance clause is a defense which the insurer must plead and prove. *Home Insurance Co. v. Eisenson,* 181 F.2d 416, 419 (5th Cir.1950); *Texas City Terminal Ry. v. American Equitable Assurance Co.,* 130 F.Supp. 843, 863 (D.C.Tex.1955); *Anderson v. Connecticut Fire Insurance Co.,* 231 Minn. 469, 478, 43 N.W.2d 807, 813–14 (1950); *New York Underwriters' Insurance Co. v. Shanks,* 78 S.W.2d 1026, 1030 (Tex. Civ.App.1935); *see generally* Annot., 43 A.L.R.3d 566 (1972).

■ The trial court found the actual cash value of the property in the building to be $47,891.34, making allowances for deprecia-

tion. The policy provided coverage of $53,000, greater than the coinsurance clause required Kress to carry. Because BTM had the burden of proof on this issue, we can overturn the trial court's finding only if BTM proved as a matter of law that the property was insured for less than eighty percent of its actual cash value. "Seldom does a party who has the burden of proof on an issue sustain his burden as a matter of law." *Johnson v. Svoboda,* 260 N.W.2d 530, 536 (Iowa 1977); *Davis v. Gatewood,* 228 N.W.2d 84, 85 (Iowa 1975). After having examined the record, we find that BTM has failed to establish a breach of the coinsurance clause as a matter of law.

■ IV. *Damages.* In addition to the damages the trial court awarded, Kress argues that he is entitled to an award on account of BTM's refusal to pay and delay in paying the claim. He asserts that the trial court erred in not awarding damages for

(1) current replacement cost of personal property

  (a) lost in the fire, and

  (b) subsequently lost in mortgage foreclosure;

(2) loss of other personal property and also real estate;

(3) loss of business profits;

(4) attorney fees for defending the declaratory judgment action; and

(5) punitive damages on account of bad faith.

Is BTM liable for damages incurred as a result of its refusal to pay the claim and to do so promptly?

The present case does not involve a third-party claim. This court has refused to recognize an independent tort action based on allegations of bad-faith failure of an insurer to settle an insurance claim with its own insured. *Seeman v. Liberty Mutual Insurance Co.,* 322 N.W.2d 35, 41 (Iowa 1982); *Long v. McAllister,* 319 N.W.2d 256, 261 (Iowa 1982). *See also Higgins v. Blue Cross of Western Iowa and South Dakota,* 319 N.W.2d 232, 235–36 (Iowa 1982); *M–Z Enterprises, Inc. v. Hawkeye Security Insur-*

*ance Co.,* 318 N.W.2d 408, 414 (Iowa 1982). In addition, in this case a dispute over liability existed on the issues of ultra vires and insurable interest.

Not finding an independent tort action here, we are left with the breach of an insurance contract. The authorities are in agreement as to the damages for such a breach:

> The amount of the recovery under a fire insurance policy is governed by the terms of the contract and includes as a general rule, within the limits of the policy, the damage caused by the fire.

46 C.J.S. *Insurance* § 1392a (1946). Also:

> The insurer's obligation or liability under a policy of fire insurance is measured and defined by the terms of the policy; the insured is entitled to recover to the extent of his loss occasioned by the fire, not exceeding the maximum amount stated in the policy.

45 C.J.S. *Insurance* § 915a (1946). While recognizing some jurisdictions allow consequential and punitive damages for willful failure to pay claims, the editor states in Annotation, 47 A.L.R.3d 314, 326 (1973):

> In accordance with the rule that the general measures of damages, in an action for breach of a contract to pay a sum of money, and in the absence of special circumstances in the contemplation of the parties at the time of the making of the contract, is the principal sum agreed to be paid by the terms of the contract, with legal interest thereon, it has been held that consequential damages, resulting from the failure or delay of an insurer in making payments due under an insurance contract are, as a general proposition, and without regard to any special circumstances indicating that such damages were within the contemplation of the parties, not recoverable, limiting recovery for such breach of contract to the amount due under the policy, with interest.

We pass to consideration of the items of additional damages which Kress claims.

■ Replacement cost of personal property. Kress argues that BTM should pay

the present replacement cost of the destroyed property, not the amount its replacement cost would have been at the time of loss.

Such a requirement would be contrary to the policy and to the authorities. The policy states that Kress is insured

> to the extent of the actual cash value of the property *at the time of loss,* but not exceeding the amount which it would cost to repair or replace the property with material of like kind and quality *within a reasonable time after such loss.*

(Emphasis added.) The cases hold the damages are to be assessed as of the date of the loss. *Gustafson v. Central Iowa Mutual Insurance Ass'n,* 277 N.W.2d 609, 611 (Iowa 1979); *Lubin v. Iowa City,* 257 Iowa 383, 394, 131 N.W.2d 765, 772 (1965); *J & H Auto Trim Co., Inc. v. Bellefonte Insurance Co.,* 501 F.Supp. 942, 951 (M.D.Fla.1980) (applying Florida law). *See also* 6 *Appelman, Insurance Law and Practice* § 3824 (1981) ("If an item covered by a fire policy is damaged beyond repair ... the insurer will only be liable for the total sound value of the item *at the date of the loss."* (Emphasis added.)).

■ Loss of other property and business profits. We may consider together Kress's items of loss of personal and real property from foreclosure and loss of profits. As a result of the fire, Kress was unable to continue full operations. He was also suffering other financial problems and contends that if the insurance proceeds had been timely paid, he could have averted business failure and prevented a mortgage foreclosure on the insured premises.

Assuming arguendo that Kress proved failure to pay the insurance proceeds damaged his business, an award for these items would not have been justified. The policy states that coverage does not extend to "compensation for loss resulting from interruption of business or manufacture...."

> The loss of earnings, profits, rents, or other such losses as may result from the destruction of property by fire can be recovered only if expressly provided for in the policy.

45 C.J.S. *Insurance* § 920 (1946). As stated elsewhere:

> It is generally held that unless the loss of profits is expressly insured against a policy of fire insurance does not cover a loss of profits which the property insured might have produced.

44 Am.Jur.2d *Insurance* § 1521 (1982). Appelman states:

> The insured cannot claim, in addition, loss occasioned by the interruption or destruction of his business, nor for gains or profits which were morally certain to inure to him if the building had remained uninjured to the expiration of the policy.

5 *Appelman, Insurance Law and Practice* § 3121 (1981).

In addition, the record contains substantial evidence to support the trial court's finding that Kress's business would have failed even if the insurance proceeds had been paid at once. Exhibits introduced at trial showed Kress's indebtedness immediately prior to the fire to be $230,919. Payment of the policy limits would have produced only $65,000. Had Kress applied the insurance proceeds on the indebtedness he would not have had funds with which to replace his damaged machinery. We defer to the trial court's evaluation of the credibility of the witnesses testifying to Kress's financial condition. Several who testified that Kress could have put his business back together were creditors who stood to gain if Kress could have gotten his business going. SBA and local bank officials, on the other hand, testified that a second SBA loan had been denied Kress before the fire and that the bank had covered checks of some $17,-540 for Kress. *Cf. Berkeley Inn, Inc. v. Centennial Insurance Co.,* 282 Pa.Super. 207, 211, 422 A.2d 1078, 1080 (1980) (court denied damages for business interruption where insured's business was doomed to fail anyway).

■ Kress's claim of loss of the business due to failure to receive insurance proceeds is speculative at best. Damages for lost profits cannot be awarded in any event in the absence of evidence of their reasonable

certainty. *King Features Syndicate v. Courrier,* 241 Iowa 870, 882, 43 N.W.2d 718, 726 (1950); *Olson v. Rugloski,* 277 N.W.2d 385, 386, 388 (Minn.1979).

Attorney fees and punitive damages. These damages fall under the general principle that we do not recognize a tort action in the present circumstances. In addition, under the American rule which is followed in this jurisdiction attorney fees are not ordinarily recoverable by the prevailing party in the absence of statute. *McNabb v. Osmundson,* 315 N.W.2d 9 (Iowa 1982). As to attorney fees and punitive damages the court stated in *Deaton v. Allstate Insurance Co.,* 548 S.W.2d 162, 164 (Ky.App.1977):

> [T]he measure of recovery for failure to pay money due under the [insurance] contract is the amount agreed to be paid. Therefore, no recovery for punitive damages, as sought by the appellants, can be had, nor consequential damages such as attorney fees. . . .

Moreover, as to punitive damages a dispute over liability existed on the issues of ultra vires and insurable interest.

We find no error with respect to these several damage items.

V. *Evidentiary objections.* Kress contends the trial court refused to admit evidence of consequential damages. Because the trial court was correct in denying such claims, no error occurred in not allowing evidence of them.

VI. *Interest.* The trial court correctly calculated interest according to the applicable statutes. See Iowa Code §§ 535.2(1)(a), 535.3 (1973). *See also Lemrick v. Grinnell Mutual Reinsurance Co.,* 263 N.W.2d 714, 720 (Iowa 1978) (interest on an unliquidated claim runs from the time damage is complete although not yet fixed in a specific sum).

We uphold the judgment.

AFFIRMED.